IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 13, 2004 Session

## STATE OF TENNESSEE v. BRYAN CHRISTOPHER HESTER

**Appeal from the Criminal Court for Davidson County**
**No. 2000-D-2033    Steve Dozier, Judge**

───────────

**No. M2003-00503-CCA-R3-CD - Filed May 12, 2004**

───────────

A Davidson County Criminal Court jury convicted the defendant, Bryan Christopher Hester, of second degree murder, a Class A felony, and the trial court sentenced him as a Range I, violent offender to twenty-five years in confinement. The defendant appeals, claiming that (1) the evidence is insufficient to support his conviction; (2) the trial court erred by denying his motion to continue when the state revealed three days before trial that the victim had been taking an antidepressant and seeing a psychiatrist; (3) the trial court erred by allowing hearsay into evidence; (4) the trial court erred by allowing the state to introduce a bow saw into evidence; (5) the trial court erred by allowing a witness to testify about experiments conducted on the murder weapon when the state failed to prove the chain of custody; (6) the trial court erred by allowing the state medical examiner to testify; and (7) the defendant's sentence is excessive. We conclude that the trial court erred by allowing hearsay into evidence but that the error was harmless. We also conclude that the defendant's sentence is not excessive, and we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and JOHN EVERETT WILLIAMS, JJ., joined.

James Robin McKinney, Jr., Nashville, Tennessee, for the appellant, Bryan Christopher Hester.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Kathy Morante and Pamela Sue Anderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to the defendant's shooting Keith Crabtree on September 17, 2000. Officer Wayne Helm of the Nashville Metropolitan Police Department (Metro Police) testified that about 1:00 p.m. on September 17, he was dispatched to apartment 306 at the Heritage House Apartments for a "suicide call." When he arrived, the defendant and a female met him. Officer Helm waited for

backup to arrive and then entered the apartment. In the bathroom, he saw a naked white male lying on his side in the bathtub. The victim had been bleeding from the mouth, a pile of clothes was lying on the floor beside the tub, and a rifle was against the wall between the toilet and the bathtub. The victim appeared to be dead, and officers secured the scene.

Detective Brad Corcoran of the Metro Police testified that he arrived at apartment 306, the defendant's one-bedroom apartment, about 1:55 p.m. on September 17. He said that a gun rack and two military flags were hanging on the walls, that several dagger-type knives were in the apartment, and that empty alcoholic beverage containers were in almost every room. He said that an AR-15 .223 rifle, a twenty gauge shotgun, and several types of ammunition were on the gun rack and that officers found a .9mm handgun and more ammunition in the bedroom. He said two bullet holes were in the ceiling above the dining room table, five bullet holes were in the dining room wall, one bullet hole was in the bedroom ceiling, and one bullet hole was in the south bathroom wall above the bathtub. He said that a bow saw and a .22 rifle were in the bathroom and that the victim was lying in the bathtub. He said that the defendant, the defendant's girlfriend, and the defendant's father were present and that the defendant had a black left eye but no other significant injuries. He said he took the .22 rifle and several wooden sticks from the apartment. He said the wooden sticks looked like broom handles or table legs.

Detective Corcoran testified that he took the rifle and sticks to the victim's autopsy in order to compare them with the victim's injuries. He said that he examined the victim's clothing and that the victim's shorts and blue jeans had been cut off his body. He said that after the autopsy, he got a search warrant for the apartment and collected more evidence, including eleven carpet samples from the living room and a blood sample found on a gun case in the bedroom, and gave the evidence to the Tennessee Bureau of Investigation (TBI) Crime Laboratory. He said he also collected a pair of scissors from the bathroom. He said that after the autopsy, he gave the .22 rifle to TBI Agent Tommy Heflin for testing.

On cross-examination, Detective Corcoran acknowledged that the defendant voluntarily gave statements on September 17 and 18 and voluntarily gave blood samples. He said he did not remember asking the defendant to take off his shirt on September 17 in order to see if the defendant was injured. He said that fingerprint analysis was not done on the rifle and that he did not ask Dr. Bruce Levy to do gunpowder residue tests on the victim. He said the defendant did not leave the jurisdiction and voluntarily turned himself in to police on November 17, 2000. On redirect examination, he said a gunpowder residue test would not have revealed useful information because the test uses nitric acid and .22 cartridges contain no center-fired primer that can react with the acid. On recross-examination, Detective Corcoran acknowledged that many other types of gunpowder residue tests do not use nitric acid.

Detective David Achord of the Metro Police testified that he was dispatched to the defendant's apartment on September 17 and assisted Detective Corcoran. He said that the apartment was dirty and littered with empty alcohol containers and that the victim was lying naked in the bathtub. He said that he talked with the defendant and that the defendant was expressionless and had

-2-

a flat tone of voice. He said that he and the defendant went outside to his patrol car and that the defendant told him the following: The defendant had had a small party the night before. After his friends left the party, he and the victim got into an argument and beat each other with sticks for about fifteen minutes. After the argument, the victim went into the bathroom and the defendant heard water running. The defendant went into the bathroom and saw the victim lying in the bathtub with the rifle barrel in his mouth. The victim looked at the defendant and shot himself. Detective Achord said he noticed several inconsistencies in the defendant's story. For example, the defendant had claimed that he attempted cardiopulmonary resuscitation (CPR) on the victim, but Detective Achord noticed that blood around the victim's mouth was not smeared. Also, the defendant claimed that the victim had committed suicide about 9:00 a.m. but did not telephone the police until 1:00 p.m. and denied cutting off the victim's clothes. Detective Achord stated that after giving this verbal statement, the defendant gave a written statement.

Detective Achord testified that he asked the defendant to give a formal interview at the Criminal Justice Center and that the defendant agreed. He said the interview was videotaped, and the state played the tape for the jury. The defendant said the following during the taped interview: The victim had been staying at the defendant's apartment because the victim's parents had kicked the victim out of their house. On the night before the shooting, the victim had been happy. The defendant and the victim got into an argument and fought. During the fight, the defendant got a black eye and hit the victim in the chest a couple of times with a stick. The victim went into the bathroom, and the defendant went into the bathroom to apologize to the victim. The defendant saw the victim lying naked in the tub and the victim's clothes lying on the floor. The victim looked at the defendant and shot himself. After the victim committed suicide, the defendant pulled the gun out of the victim's hands and put the gun back on the gun rack. He tried to give the victim CPR but when he pushed on the victim's chest, blood came out of the victim's nose. The defendant did not call 9-1-1 because he panicked. He did not know how the victim's clothes got cut and denied killing the victim. A couple of days before the shooting, the defendant and the victim shot holes in the apartment walls, and the victim wrote "Bryan got pissed at Keith 9-14-00" on the dining room wall. The defendant and the victim were drunk when the victim wrote the message, but the defendant was not mad at the victim. Later on the videotape, the defendant admitted cutting off the victim's jeans and gym shorts. He said that the victim was dead when he cut off the clothes and that he did not know why he had cut the clothes off the victim.

Officer Tim Matthews of the Metro Police Identification Section testified that he arrived at the scene about 3:00 p.m. and collected and processed evidence. He said officers found five wooden sticks in the living room, five bullet holes in the dining room wall, and "Bryan got pissed at Keith 9-14-00" written on the dining room wall. He said that a .22 cartridge casing was in the hallway and that a .223 rifle, twenty gauge shotgun, .9mm pistol, and ammunition were on a gun rack in the hallway. He said that in the bedroom, officers found a .22 long rifle cartridge casing, a .223 casing, and a bullet hole in the ceiling. He said the police also found a bullet hole in the south bathroom wall above the shower head. He said that a gun case was underneath the bed and that blood appeared to be on the case. He said that the victim's blue jeans, gym shorts, and boxer shorts were lying on the floor beside the bathtub and that the jeans and gym shorts had been cut off the victim and were

damp. He said that an unloaded .22 rifle was lying on the bathroom floor and that a bow saw was in the bathroom. He said the victim was lying in the bathtub with his head toward the south wall and the tub's faucet. He said luminol revealed small spots of blood on the living room carpet and specks of blood around the bathroom sink.

On cross-examination, Officer Matthews testified that a .22 casing also was in the bathtub and that the length from the trigger to the end of the .22 rifle barrel was twenty-two and one-half inches. He said that a .223 casing found in the bedroom could not have come from the .22 rifle. He said that before officers left the apartment on September 17, they did not seal it off and acknowledged that someone could have gone in the apartment and washed his or her hands in the bathroom sink before the police returned the next day. He said he did not remember if any of the bullets found in the apartment were subsonic bullets.

Dr. Bruce Levy testified that he is the Chief Medical Examiner for the State of Tennessee and that he performed the victim's autopsy. He said the victim had a gunshot wound in the roof of his mouth and a gunshot wound in his right thigh. He said he did not find gunpowder residue or stipling in the victim's mouth. He said that he found a few small bruises to the inside of the victim's lips but that he did not believe they were related to the gunshot wound. He said that he recovered a bullet from the victim's brain and that the end of the gun's barrel was at least two feet away when it was fired at the victim's mouth. He said the lack of damage to the victim's teeth indicated that the victim's mouth was open when the gun was fired. He said he had performed about seventy-five autopsies involving oral gunshot wounds but that this was the first case in which he had found no searing or stipling in the mouth. Dr. Levy also received and examined the victim's clothes and testified that he found no gunshot residue or stipling on the victim's blue jeans, indicating that the end of the gun barrel was at least two feet away when it was fired. He said the bullet traveled into the victim's leg at an upward angle, indicating that either the gun was pointed upward when it was fired or the victim's leg was bent. He said the victim's blue jeans and green mesh shorts had been cut open.

Dr. Levy testified that in addition to the gunshot wounds, the victim had a variety of superficial injuries on his body. He said that the victim had bruises and scrapes on his face, neck, chest, arms, and legs and that some of the injuries had a unique and distinct pattern. He said that two sticks taken from the defendant's apartment and held together matched the pattern of some of the bruises. He said that round bruises on the victim matched the end of one of the sticks and that the stick had been jabbed into the victim's skin at a right angle. He said that one of the sticks had a metal screw inserted in one end and that a small round injury on the victim's chest matched the screw. He said the small round injury was surrounded by an outer ring, indicating that significant force was used to leave the mark from the screw and the outer ring from the end of the stick. He said that in his opinion, the sticks were used to beat the victim. He said that the victim suffered an injury to a knuckle on his right hand and that the injury could have been an offensive or defensive wound. He said the victim also had some injuries to the backs of his forearms and hands, which could have been defensive wounds or could have occurred during a struggle. He said the victim had one broken rib but no injuries to his back or genitals. He said that the oral gunshot wound was the victim's only

fatal wound and that it may not have caused instantaneous death. He said blood in the victim's lungs indicated that the victim inhaled blood before he died. He said that the victim could have lived for several hours and that the victim would have coughed and gurgled during that time. He said marijuana metabolites were in the victim's urine but not his blood, indicating that the victim had used marijuana sometime before his death but that he was not under the influence of the drug when he died. He said that the victim's blood tested negative for alcohol and that he had never seen a person shoot himself in a nonfatal area of the body before committing suicide. He concluded that the manner of death was a homicide.

On cross-examination, Dr. Levy testified that he had not known at the autopsy that the victim had been treated by a psychiatrist for depression but that the information would not have changed his conclusion as to the manner of death. He said that a .22 short rifle cartridge was less likely to leave soot and stipling than a .22 long cartridge because a .22 short cartridge contains less gunpowder. He said that the longer the gun barrel, the more gunpowder that is consumed before the bullet exits the barrel. He said he visually inspected the victim's mouth for soot and stipling and stuck his gloved hand in the victim's mouth but found no gunpowder. He said he did not cut out a portion of the victim's palate in order to inspect it with a dissecting microscope for gunpowder. He said that if water had gotten into the victim's mouth, it could have washed away soot but that it would not have washed away stipling. He acknowledged that the bruises on the victim's lips could have been caused by a gun's recoil but said that it was unlikely. He said the victim's teeth and tongue were undamaged and characterized the oral gunshot wound as a perfect shot or a lucky shot. He acknowledged that alcohol would have affected a person's ability to hold the rifle steady and make a perfect shot. He also acknowledged that if the victim had been shot in another room of the apartment and then moved to the bathroom, blood should have been somewhere else in the apartment. He said he looked for soot on the victim's hands but did not conduct a gunpowder residue test because it is notoriously inaccurate. He said that only about twenty-five percent of people who commit suicide leave a suicide note.

On redirect examination, Dr. Levy testified that the bruises on the victim's lips probably resulted from the victim being struck in the mouth or falling and hitting his mouth against something. He said that this case was different from all other suicide autopsies he had conducted because the only damage to the victim's mouth was a hole in the roof. He acknowledged that the victim's mouth may have been open because the victim was yelling.

Rachel Norfleet testified that she had known the defendant about three years and was his ex-girlfriend. She said that she had gone to Benton Hall School with the defendant and the victim and that the defendant and the victim were friends. She said that on September 16, 2000, the defendant had a party at his apartment but that she was not there. She said that the next day, the defendant telephoned her about 10:00 a.m., told her that he and the victim had gotten into a fight, and told her that something had happened. She said that the defendant picked her up at her house and that they parked at a gas station. She said that four days before the shooting, the defendant had told her the victim was depressed. She said that while she and the defendant were parked at the gas station, she asked him what had happened and the defendant said, "[W]hat do you think?" She said she thought

the victim had committed suicide and asked the defendant if he had anything to do with it. She said the defendant stated no but that he did not want to telephone the police because he was afraid they would think he killed the victim.

Ms. Norfleet testified that she and the defendant drove to the defendant's apartment, that she telephoned the defendant's father, and that she did not notice any bloodstains on the living room carpet. She said the defendant told her that he had cut the victim's clothes off because he "freaked out" and that he had put the .22 rifle back on the gun rack. She said that when the defendant's father arrived, the defendant told him that the victim had committed suicide. She said the defendant's father went into the bathroom, came back into the living room, and called the police. She said she had been in the apartment two days before the shooting and had not seen any writing on the dining room wall. She also said that she would not have noticed bullet holes in the dining room wall because the defendant had a lot of bullet holes in the apartment. She said she had never seen a bow saw in the defendant's bathroom before. On cross-examination, Ms. Norfleet testified that she did not remember if the defendant told her he attempted CPR on the victim. She said that when the defendant picked her up at her house, he was crying and shaking. She said the victim had asked to stay at the defendant's apartment because the victim had been kicked out of his parents' home. She said she also had heard that the victim had lost his job recently. She said that she had talked to the defendant about 11:00 p.m. the night before the shooting, that the defendant sounded like he had been drinking, and that she did not hear any scuffling or fighting.

Mike Turbeville, a forensic scientist with the TBI Crime Laboratory, testified that he conducted DNA tests on blood evidence collected in the case. He said that two blood spots on the living room carpet and a blood spot on the gun case matched the defendant, that two blood spots on the living room carpet matched the victim, and that one blood spot on the living room carpet was a mixture of the defendant's and the victim's blood.

James F. Rottmund of the Metro Police and an expert in firearms and toolmark examining testified that he analyzed the firearm evidence in this case. He said that the amount of force needed to pull the trigger on the .22 rifle was 3.6 pounds, which was not unusual. He said he test-fired the rifle, collected the bullets, and compared the test-fired bullets to bullets recovered from the victim. He said that the bullets taken out of the victim's head and thigh were fired from the .22 rifle and that both of the bullets came from .22 long rifle cartridges, which produce more gunpowder residue when fired than .22 short rifle cartridges. He said that he also examined three .22 long rifle cartridge casings and one .22 short rifle cartridge casing that police found in the apartment and that all of them came out of the .22 rifle. He said he examined the victim's jeans and found no gunpowder residue around the bullet hole, indicating that the end of the barrel had been more than thirty inches away from the victim's leg when the rifle was fired.

On cross-examination, Officer Rottmund testified that he inspected the victim's clothing on July 11, 2002, and that the clothes were moldy. He acknowledged that the presence of moisture on the jeans could affect the ability to detect gunpowder residue. He said that the two bullets recovered from the victim were subsonic bullets and that the cartridge casing recovered from the bathtub was

a subsonic casing. He said a subsonic rifle cartridge could have less gunpowder than a regular cartridge. He said that more gunpowder is consumed in guns with long barrels and that the barrel of the .22 rifle in this case was eighteen and one-half inches long.

Brenda Crabtree, the victim's mother, testified that the victim was eighteen years old at the time of his death and recently had graduated from Benton Hall School. She said that in January 2000, she came home and found the victim high on drugs and that the victim went into a twenty-nine-day inpatient treatment program at Cumberland Heights. She said that after the victim completed the program, he went into outpatient treatment and was still in the outpatient program at the time of his death. She said that she last saw the victim on September 16, 2000, at a Cumberland Heights picnic and that the victim was supposed to receive recognition for six months of sobriety but left the picnic before awards were given out. She said that on September 16, the victim no longer lived at home but that she talked to him everyday. She said the victim moved out of her house in August 2000 and moved in with his grandparents. She said that she did not make the victim leave her home and that they were on good terms. She said the victim lived with his grandparents for two and one-half weeks and moved out of their home a few days before he died. She said that in the days before his death, the victim was happy and thinking about going to work on a ranch in Arkansas. She said that the victim started seeing a psychiatrist after he got out of Cumberland Heights and that the doctor prescribed Paxil, an antidepressant. She said that the victim had stopped seeing the psychiatrist about three months before his death but that she had not noticed him being sad or depressed. On cross-examination, Ms. Crabtree acknowledged that the victim previously had had problems with alcohol and anger management. She said that at the time of his death, the victim was working in the shipping department at Genesco. She said that the victim purchased a rifle while he was still living in her home but that he kept it at Will Howe's house.

Kimmy Lee Suzuki testified for the defendant that she went to high school with and used to date the victim. She said that while she was dating the victim, students often picked on him and he mentioned suicide several times. On cross-examination, she said that she had not known the victim was treated for substance abuse at Cumberland Heights. She said that she also had dated the defendant and that she had wanted to marry the defendant.

Dan Hester, the defendant's father, testified that the defendant went to Benton Hall, which is a private school for children with attention deficit disorder (ADD) or special needs. He said the defendant graduated in 2000 and enrolled in art school. He said that the defendant moved out of his home in June 2000 and that he was in the defendant's apartment four days before the shooting. He said that the apartment was well-maintained and that he did not see any bullet holes in the walls. He said Rachel Norfleet telephoned him on the afternoon of September 17 and told him to come to the apartment. He said that when he arrived, the defendant was in a fetal position on the couch and was crying and screaming. He said that the defendant's eye was black and swollen shut and that the defendant had small cuts on his face. He said he went into the bathroom, saw the victim in the bathtub, and checked the victim's pulse. He said that the victim was dead and that he went to the kitchen and telephoned 9-1-1. He said that the defendant told him the defendant had seen the victim commit suicide and that he asked the defendant where the rifle was. He said that the defendant got

the .22 rifle out of the gun rack and gave it to him and that he put the gun on the floor beside the tub. He said that when the police arrived, they asked him, the defendant, and Ms. Norfleet to leave the apartment and that the defendant later left the scene with Detective Corcoran. He said that after all of the officers had left the apartment, he went back into the apartment, rinsed blood out of the tub, and cleaned the tub with towels. He said he rinsed the towels out in the bathroom sink and washed his hands. He said the defendant had a twenty-pound cat and kept a covered litter box in the bathroom. He said the bow saw had been in the bathroom because the defendant was going to cut a larger hole in the box in order for the cat to get inside.

On cross-examination, Mr. Hester testified that he had been in the Marines and gave the defendant part of his gun collection. He said that on the night of September 17, he saw bruises on the defendant's lower legs. He said that he did not see blood in the apartment and that he did not clean the carpet. He acknowledged that the defendant had suffered from depression but said he was not concerned about the defendant's having weapons. He said that although the bow saw was lying on top of the litter box, the opening to the litter box had not been cut.

Dr. David Michael McElroy testified as an expert in forensic psychology and said that he had reviewed the victim's psychiatric records from Vanderbilt and treatment records from Cumberland Heights. He said that the victim had been admitted to Cumberland Heights for multiple substance abuse and that the victim was diagnosed at Vanderbilt with major depressive disorder, a severe condition. He said the victim's Vanderbilt records showed that the victim had mentioned suicidal intent several times. He said the victim's psychiatrist had prescribed Paxil but that Dr. Levy did not find Paxil in the victim's blood. He said that the victim had not been taking his medication and that being kicked out of his parents' home and losing his job would have been major stressors in the victim's life. He said he thought the victim had a high suicide risk. On cross-examination, Dr. McElroy testified that he only reviewed the victim's records and did not talk with the victim's friends, family, or psychiatrist. He acknowledged that not all people who take Paxil are suicidal.

Veronica Paradis, a teacher at Benton Hall, and Rob McFadden, a guidance counselor at Benton Hall, testified on rebuttal. Ms. Paradis said that she never saw any signs the victim was suicidal or intensely sad and that he was polite, kind, and eager to please. She said the victim took summer school classes in 2000 and was very excited about going to work on a "farm type thing." She said the victim had a very positive self-image that summer and was very religious. She said she would not describe the victim and the defendant as good friends. Mr. McFadden said that he knew the victim had a substance abuse problem and that the victim finished summer school at the end of July 2000. He said the victim was upbeat and planning to work on a ranch in Arkansas. He said that he saw the victim two days before the victim's death and that the victim was smiling and happy. Although the defendant had been charged with first degree murder, the jury convicted him of second degree murder.

# I. SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence is insufficient to support his conviction because the proof showed that the victim was suicidal. He claims that minimal evidence supports his conviction and that the evidence against him primarily consists of Dr. Levy's opinion that the rifle was at least two feet away from the victim when it was fired. He claims that Dr. Levy's opinion is not trustworthy because Dr. Levy did not conduct any scientific tests such as using a dissecting microscope to look for soot or stipling in the victim's mouth. The state argues that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A conviction for second degree murder requires proof that the defendant unlawfully and knowingly killed another. See T.C.A. §§ 39-13-201, -210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. T.C.A. § 39-11-302(b).

The evidence shows that the victim was shot in the thigh and mouth and was severely beaten. Dr. Levy testified that he visually inspected the gunshot wound in the victim's mouth and put his gloved hand inside but found no gunpowder or stipling to indicate that the barrel of the rifle had been near the victim's mouth when it was fired. Although he did not use a dissecting microscope, he also found no gunpowder residue on the victim's blue jeans, indicating that the rifle was at least two feet away when it was fired at the victim's leg. Tests on the .22 rifle found in the defendant's bathroom revealed that the bullets in the victim's mouth and thigh were fired from that gun. In addition to his two gunshot wounds, the victim had been severely beaten with wooden sticks all over the front of his body. Although the defendant claimed that the victim committed suicide, he put the rifle on the gun rack, cut off the victim's clothes, and did not telephone the police. Moreover, although the defendant claimed that the victim had been suicidal several days before the shooting, witnesses testified that they had seen the victim several days before his death and that he was happy. The defendant also told the police that the victim was happy the night before the shooting. The jury discredited the defendant's theory that the victim committed suicide, which was its prerogative. We hold that the evidence is sufficient to warrant a rational juror to find beyond a reasonable doubt that the defendant knowingly killed the victim.

## II. MOTION TO CONTINUE

The defendant claims that the trial court erred by refusing to grant a continuance when the state informed the defense a few days before trial that the victim had been taking an antidepressant and seeing a psychiatrist. He contends that he was prejudiced by the trial court's denying his motion because he did not have time to investigate these facts. He claims that while he was able to hire a defense expert to testify about the victim's substance abuse and mental health records, his attorney was unable to prepare properly for the expert's testimony. The state argues that the defendant has failed to demonstrate prejudice because he has not shown how having the information earlier would have helped his case.

The record reflects that on Monday, July 22, 2002, the first day of trial, the defense filed a motion to continue, claiming that the defense had learned in a meeting with the state on Friday, July 19, 2002, that the victim had been prescribed Paxil, a drug used to treat people with depression and suicidal tendencies. The defense claimed that because its theory of the case was that the victim committed suicide, a continuance of four to six weeks was warranted in order for the defense to investigate the possibly exculpatory information. No hearing on the defendant's motion for a continuance and no order denying the motion is in the appellate record. However, an order stating the following is in the record:

> This cause came to be heard on July 22, 2002, upon the motion of the defendant, to have the Court review in camera any medical records regarding Keith Crabtree. The State agrees that these records should be reviewed in camera for the Court to determine whether any of the records are potentially exculpatory. Therefore, based upon the agreement of the parties it is hereby ordered that a subpoena duces tecum be issued to Dr. Paul Ragan M.D., Vanderbilt Department of Psychiatry to bring any and all records regarding the treatment, diagnosis, and prognosis of Keith Crabtree. These items should be delivered to [the trial court]. . . .

Nothing in the record reveals whether the trial court received or reviewed the victim's records, and nothing reveals whether the trial court determined that the records contained exculpatory information.

The decision whether to grant a continuance rests within the discretion of the trial court. State v. Morgan, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991). The denial of a continuance will not lead to a reversal absent an abuse of discretion and resulting prejudice. See State v. Seals, 735 S.W.2d 849, 853 (Tenn. Crim. App. 1987).

Although the defendant's brief claims that the trial court denied his motion to continue, the defendant has failed to include the transcript of the hearing on the motion or any order denying the motion in the appellate record. It is the duty of the appellant to prepare a record that conveys a fair,

accurate, and complete account of what transpired in the trial court with respect to the issues that form the basis of the appeal. T.R.A.P. 24(b); State v. Miller, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987); State v. Rhoden, 739 S.W.2d 6 (Tenn. Crim. App. 1987). Generally, this court is precluded from addressing an issue on appeal when the record fails to include relevant documents. See Tenn. R. App. P. 24; State v. Bennett, 798 S.W.2d 783 (Tenn. Crim. App. 1990). Without a record of the proceedings on the motion to continue, we must presume that the trial court ruled correctly based on the information presented at the motion hearing.

In any event, as the state correctly points out in its brief, the defendant has failed to show how he was prejudiced by the trial court's refusing to grant a continuance. The defendant presented no evidence at the hearing on his motion for new trial as to how receiving the information earlier would have changed his direct examination of his expert, Dr. McElroy, or how the information would have changed the outcome of his case. The trial transcript shows that through the defendant's expert, the jury heard that the victim had received treatment for multiple substance abuse, had been treated by a psychiatrist, had been prescribed an antidepressant drug, and had stopped taking the medication. The jury also learned that the victim had mentioned suicidal intent to the psychiatrist several times and that Dr. McElroy considered the victim to be a high suicide risk. Such testimony supported the defendant's theory that the victim committed suicide, and he has failed to show how he was prejudiced by the trial court's denying his motion to continue. We conclude that the trial court did not abuse its discretion by denying the defendant's motion for a continuance.

### III. HEARSAY

The defendant contends that the trial court erred by allowing the state to introduce into evidence that "Bryan got pissed at Keith 9-14-00" had been written on the defendant's dining room wall. He claims that the statement was inadmissible hearsay and that even if it was not hearsay, allowing the statement into evidence denied him the right to confront or cross-examine the statement's declarant. The state claims that the trial court properly allowed the writing into evidence. We conclude that the statement was hearsay but that the defendant is not entitled to relief.

The record reflects that on the first day of trial, the defense filed a motion in limine, requesting that the trial court prohibit the state from presenting evidence about the statement because the statement was hearsay. The court minutes for that day show that the trial court denied the motion. However, a transcript of the hearing is not in the appellate record. In a jury out hearing on the second day of trial, the trial court explained that the statement, written on the wall days or hours before the victim's death, was not hearsay and was relevant to show that the victim and the defendant had an unstable, volatile relationship. The trial court stated,

> And I do agree with the State, it doesn't necessarily matter that that statement written on the wall is true or not, but it goes to explain what's going on in terms of this relationship. . . . I would allow that proof to explain the relationship and put into context the defendant's statement.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A statement is "(1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion." Tenn. R. Evid. 801(a). Hearsay is not admissible except as provided by the rules of evidence or otherwise by law. Tenn. R. Evid. 802. Moreover, even if a statement falls under one of the exceptions to the hearsay rule, the statement still must be relevant in order to be admissible. See Tenn. R. Evid. 401, 402. In determining whether a statement is hearsay, it is often necessary to determine the party's purpose for introducing the statement into evidence. See Neil P. Cohen et al., Tennessee Law of Evidence § 8.01[8] (4th ed. 2000).

In this case, the transcript for the motion hearing, during which the state would have explained its purpose for using the statement, has not been included in the record. Also, opening and closing arguments during which the state may have revealed its purpose for using the statement have not been included in the record. Nevertheless, we conclude that trial court erred by determining that the statement was nonhearsay for the purpose of showing the volatility of the defendant's and the victim's relationship because showing the volatility of their relationship depended upon the statement's being true. In other words, the statement had to be true in order to demonstrate that the defendant and the victim had a volatile relationship. If not true, it shows nothing about the defendant's relationship to the victim that could lead to homicide. Thus, despite the state's claim to the contrary, the statement was being offered for the truth of the matter asserted and was hearsay. However, the statement still may have been admissible if it fell under one of the exceptions to the hearsay rule and was relevant.

The defendant told detectives that the victim authored the writing. However, as with the testimony of witnesses, the jury was entitled to believe part of the defendant's statements to police while rejecting other parts. Batey v. State, 527 S.W.2d 148 (Tenn. Crim. App. 1975). If the defendant wrote the statement, then the statement fell under the hearsay exception for admissions by a party opponent. See Tenn. R. Evid. 803(1.2)(A). Moreover, the defendant's writing the statement on the wall would have been relevant to show that the defendant was angry with the victim three days before the shooting and had a motive to shoot the victim. On the other hand, if the victim or a third party wrote the statement, then the statement may have been admissible to show the victim's or the third party's state of mind. See Tenn. R. Evid. 803(3) (providing that a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition" is an exception to the hearsay rule). However, even if the statement fell under the state of mind exception to the hearsay rule, the statement would have been irrelevant. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. The victim's or a third party's statement, expressing the belief that the defendant was mad at the victim, is not probative as to whether the defendant killed the victim. See State v. Leming, 3 S.W.3d 7, 17-18 (Tenn. Crim. App. 1998); see also Tenn. R. Evid. 803(3), Advisory Commission Comment (stating that "only the declarant's conduct, not some third party's conduct, is provable by

this hearsay exception"). Thus, the statement only was admissible if the defendant wrote it. Given that the statement's author was unknown, the trial court should have excluded it from evidence.

In any event, we conclude that even if the trial court improperly admitted the hearsay statement into evidence, the error was harmless. The defendant told detectives that he and the victim beat each other with sticks for about fifteen minutes, that the victim went into the bathroom, that he saw the victim lying in the tub with the gun in the victim's mouth, and that he saw the victim shoot himself. However, Dr. Levy found no damage to the victim's tongue or teeth and no soot or stipling to indicate that the end of the rifle barrel was in the victim's mouth when the gun was fired. Moreover, the proof established that the victim had been beaten severely with the wooden sticks recovered from the defendant's living room while the defendant sustained only a black eye. In addition to the victim's oral gunshot wound, bruises, and scrapes, he had a gunshot wound to the right thigh. However, the defendant never reported hearing a second gunshot, and Officer Rottmund testified that the end of the rifle barrel was at least thirty inches away from the victim's leg when the gun was fired. Despite his claim that the victim committed suicide, the defendant cut off the victim's clothes and never contacted the police. Instead, the defendant's girlfriend telephoned the defendant's father, who called the police after finding the victim dead in the defendant's tub. Considering the whole record, we cannot say that the error more probably than not affected the judgment in this case. See T.R.A.P. 36(b).

## IV. BOW SAW

The defendant claims that the trial court erred by allowing the state to introduce the bow saw found in the defendant's bathroom into evidence. He contends that the saw had no probative value and prejudiced the jury against him by suggesting that he intended to dismember the victim. The state claims that the trial court properly determined that the saw was relevant and that its probative value was not outweighed by the danger of unfair prejudice. We conclude that the trial court properly admitted the saw into evidence.

The day after the state mentioned the bow saw in its opening statement, the defendant filed a motion in limine asking the trial court to exclude the bow saw from evidence. Before bringing the jury into the courtroom, the trial court held a hearing on the motion. During the hearing, the defense argued that the bow saw was irrelevant because no evidence suggested that the defendant had tried to dismember the victim with the saw. The state argued that the saw was relevant because the defendant's cutting the victim's clothes off indicated that he intended to use the saw to cut up and hide the victim's body, supporting the state's theory that the defendant intentionally killed the victim. The state also noted that although the defense had known about the saw for a long time, it had waited until the second day of trial to file its motion in limine and the state already had mentioned the saw in its opening statement. The trial court ruled that because the police had found the saw in the bathroom, as opposed to an attic or tool shed, and because the defendant had cut the victim's clothes off, the saw was relevant to the defendant's intent and admissible.

-13-

As previously stated, Rule 401, Tenn. R. Evid., provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Tenn. R. Evid. 403. The trial court has discretion in determining whether evidence meets the test for relevancy. State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). Assessing the probative value and danger of unfair prejudice regarding the evidence also falls within the trial court's discretion. State v. Burlison, 868 S.W.2d 713, 720-21 (Tenn. Crim. App. 1993). This court will only reverse a trial court's decision if the trial court abused its discretion. State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995).

We conclude that the trial court properly allowed the saw into evidence. The defendant claimed that the victim committed suicide. However, the medical examiner testified that the victim did not shoot himself and that his clothes had been cut off his body. The defendant admitted to the police that he cut off the victim's clothes, that he put the rifle back on the gun rack, and that his father telephoned the police several hours after the shooting. Moreover, the defendant's girlfriend testified that she had never seen a bow saw in the bathroom before. Given the state's theory that the defendant intentionally killed the victim, we agree with the trial court that the saw was relevant, and we do not believe the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. The trial court properly admitted the saw into evidence.

## V. OFFICER ROTTMUND'S TESTIMONY

The defendant claims that Officer Rottmund's testimony about his experiments with the .22 rifle and ammunition should have been excluded because the state failed to establish a chain of custody for the evidence. The state claims that the defense waived this issue. We agree with the state.

After Detective Corcoran testified on the second day of trial, the trial court dismissed the jury for the day, and the state asked the defense, "Are we going to need to call all the chain of evidence people from the T.B.I. . . . . I just need to know whether you're going to insist on us calling them or not?" The defense told the trial court, "Judge, I haven't made up my mind yet." On the third day of trial, the state called Officer Rottmund as its last witness. The defense did not object. Officer Rottmund testified that based on experiments he performed with the .22 rifle and his examination of the victim's clothing, he concluded that the bullets recovered from the victim were fired from the rifle and that the end of the rifle barrel had been at least thirty inches away from the victim's leg when it was fired. On cross-examination, Officer Rottmund testified that he performed the tests almost two years after the shooting and that he did not know who had been in control of the weapon and ammunition during that time. After his testimony, the state rested its case in chief and the defense made a motion for a judgment of acquittal, which the trial court denied. The defense then requested that the trial court strike Officer Rottmund's testimony on the basis that the state had failed to establish a chain of custody for the rifle, ammunition, and clothing and because the defense had

received some information about the experiments only recently. The trial court denied the motion, holding that the defense was "well aware of the issues" and cross-examined the officer effectively.

As the state points out in its brief, the defendant waited until well after Officer Rottmund's testimony before objecting. The failure to object contemporaneously constitutes a waiver of the issue pursuant to Rule 36(a), T.R.A.P.

## VI. DR. LEVY'S TESTIMONY

The defendant claims that the trial court erred by allowing Dr. Levy to testify that the manner of the victim's death was a homicide. He contends that Dr. Levy was not qualified to give that opinion and that this was an issue to be determined by the jury. The state claims that the trial court properly allowed Dr. Levy's testimony. We agree with the state.

Rule 702, Tenn. R. Evid., provides that if "scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." The trial court "shall disallow [an expert's] testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." Tenn. R. Evid. 703. Determinations concerning the admissibility of expert testimony, including the basis of the expert opinion, are within the discretion of the trial court. State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993); see also State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997). However, the jury determines the weight and credibility of the expert's testimony. State v. Anderson, 880 S.W.2d 720, 732 (Tenn. Crim. App. 1994). Testimony is not objectionable merely because it embraces an ultimate issue before the trier of fact. Tenn. R. Evid. 704.

We believe the defendant's claims that Dr. Levy was not qualified to give his opinion about the manner of the victim's death and that his opinion invaded the province of the jury are without merit. During voir dire, Dr. Levy testified that he is a physician; certified by the American Board of Pathology in anatomic pathology, clinical pathology, and forensic pathology; and the Chief Medical Examiner for the State of Tennessee and the County Medical Examiner for Davidson County. He also testified that he is statutorily required to investigate certain types of deaths and rule on the causes and manners of those deaths. During his direct examination, he testified that he had performed about seventy-five autopsies involving gunshot wounds to the mouth and hundreds of autopsies involving suicide. He testified that he believed the victim's manner of death was a homicide because he found no soot or stipling in the victim's mouth and because the victim suffered numerous other injuries. Dr. Levy established a basis for his opinion about the victim's manner of death, and we conclude that his testimony was proper.

## VII. EXCESSIVE SENTENCE

Finally, the defendant claims that his sentence is excessive. Specifically, he contends that the trial court failed to consider as a mitigating factor the fact that he had been "somewhat confined"

by an electronic monitoring system from January 2001 to July 2002 while on bond in this case. The state claims that the trial court properly refused to apply this mitigating factor because the defendant's father found him intoxicated and in the possession of a loaded gun while being electronically monitored. We conclude that the trial court properly sentenced the defendant.

At the sentencing hearing, Brenda Crabtree, the victim's mother, testified that she could not describe the pain her family had experienced over the victim's death. She said that she had never known the victim to hit anyone, that the .22 rifle had a scope, and that she believed the defendant was looking through the scope when he shot the victim. She said that nothing could bring the victim back but that she wanted justice for her son.

Detective Brad Corcoran testified that while he was executing the search warrant on the defendant's apartment, he found a journal. Sergeant Johnny Hunter of the TBI Identification Unit testified that he compared a writing in the journal to the defendant's written statement to police and concluded that the defendant was the author of the writing in the journal. The writing, titled "The Boy with no future," was admitted into evidence. In the writing, a boy named Bill is beat up by another boy while they are on a school bus. Bill kills the boy, tells the bus driver that the killing was an accident, and stabs the driver and other students.

The state called no more witnesses to testify but asked that the trial court consider testimony given by Brad Harris during a jury out hearing at the defendant's trial. The trial court agreed. In the jury out hearing, Mr. Harris had testified that he went to Benton Hall with the defendant and was at a party with the defendant on May 5, 2000. He said that he drank too much alcohol at the party, that he was not feeling well, and that he went to an upstairs bedroom to lie down. He said that the defendant came upstairs and that he went downstairs with the defendant in order to drink more beer. He said that he told the defendant he could not drink any more and that he got sick. He said that he heard the defendant tell someone that the defendant "wanted to see what it's like to mess with someone" and that the defendant knocked him down and began beating him. He said that the defendant put a knife to his throat, threatened to cut him, and tried to get him to hit the defendant back. He said that the defendant threatened to kill him if he told anyone about the beating and that the defendant said he was going to cut up Mr. Harris's body. On cross-examination, Mr. Harris testified that he did not report the incident to the police and that he had used marijuana at the party.

Dan Hester, the defendant's father, testified that as a condition of the defendant's bond, the defendant was electronically monitored for almost two years while awaiting trial. He said that during that time, the defendant was allowed to go only to work and church. He said that the defendant also had to take a monthly drug screen and that the defendant passed all of his drug tests. He said the defendant started using inhalants when the defendant was twelve years old and received treatment for drug and alcohol abuse at Vanderbilt and Cumberland Heights. He said the defendant had received inpatient treatment four or five times and also had received outpatient treatment. He said the defendant had been diagnosed with ADD and major depression and transferred to Benton Hall because the defendant was not adjusting well in public school. He said that while the defendant attended Benton Hall, the defendant received counseling and kept a journal in order to express his

feelings. He said the defendant continued to receive counseling while the defendant was on bond and awaiting trial. He said that he was shocked at some of the things the defendant had written in the journal but that the journal was part of the defendant's treatment plan.

On cross-examination, Mr. Hester acknowledged that the journal writing introduced into evidence involved a fantasy of mutilating children on a school bus and masturbating and that the defendant wrote the story sometime before the victim was killed. He also acknowledged that as a condition of his bond, the defendant was not supposed to be around guns. He said that he kept guns locked in a safe in his home and that he returned home one day to find the defendant under the influence of drugs or alcohol and in the possession of a loaded .22 rifle. He said the defendant had the gun between his legs and pointed at the defendant's head. He said that the defendant refused to give him the gun and that he telephoned the police. He said that police officers surrounded his home, that the defendant's counselors came and talked to the defendant, and that the defendant gave the gun to the counselors. He acknowledged that at the time of the victim's death, the defendant was on probation for assault and resisting arrest.

According to the presentence report, the then twenty-year-old defendant graduated from high school and attended graphic arts school for four months. In the report, he stated that he had suffered from a stiff back for several years but did not report any other physical problems. He also stated that he was admitted to Vanderbilt Psychiatric Hospital for seven days when he was twelve or thirteen years old and that he was diagnosed at that time with depression and bipolar disorder. He said that he had been prescribed Prozac and Depakote but that he was not taking any medications at the time of the offense in question. The defendant reported that he began using alcohol and marijuana when he was thirteen years old, that he used the marijuana daily until he was eighteen, and that he used LSD and mushrooms once a month from ages sixteen to nineteen. He said that he had received five days of treatment for psychiatric problems and substance abuse at Vanderbilt Hospital in June 2002 and that he had not consumed any alcohol since that time. According to the report, the defendant was convicted in 2000 of misdemeanor drug possession, misdemeanor assault, and resisting arrest.

The trial court applied enhancement factors (2), that the defendant "has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range"; (6), that the defendant treated the victim with exceptional cruelty during the crime; and (10), that the defendant used a firearm while committing the offense, and gave great weight to factors (2) and (10). See T.C.A. § 40-35-14(2), (6), (10). The trial court refused to apply the defendant's being electronically monitored as a mitigating factor under T.C.A. § 40-35-13(13) because the defendant had been found intoxicated and with a loaded gun while on bond. The trial court increased the defendant's sentence from the presumptive twenty years to twenty-five years.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper

weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

The range of punishment for a Range I defendant convicted of a Class A felony is fifteen to twenty-five years. T.C.A. § 40-35-112(a)(1). The sentence to be imposed for a Class A felony is presumptively the midpoint in the range unless there are enhancement factors present. T.C.A. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

In this case, we believe the trial court properly refused to apply mitigating factor (13) for the defendant's electronic monitoring because the proof established that while the defendant was on bond and being monitored electronically, he became intoxicated, took a rifle out of his father's safe, loaded it, pointed it at himself, and surrendered the gun only when police and his counselors were called to the scene. We conclude that the trial court was justified in sentencing the defendant to twenty-five years in confinement.

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.


                                              _____

                                              JOSEPH M. TIPTON, JUDGE